My name is Mark Rifkin. On behalf of the plaintiffs and appellants, I'd like to reserve three minutes, if I may, for rebuttal. All four of the plaintiffs in this case were customers of Apple. All four of them bought iPhones from Apple, and then after they bought their iPhones, all four of them bought software applications called apps from Apple on the App Store, which was created, owned, and operated entirely by Apple. All four of them paid prices for the applications that included a 30 percent markup that was demanded by Apple. All four of the plaintiffs paid their money directly to Apple, which kept the 30 percent surcharge for the applications, having forced the plaintiffs, not by choice but by virtue of technological features that Apple inserted into the iPhones or the iPhone operating systems, having forced the plaintiffs to buy apps only on Apple's App Store. They all paid their money to Apple. Apple kept its 30 percent surcharge entirely and then remitted to third parties, who were not part of this case, remitted the balance of the purchase price to those third parties. The plaintiffs complained about the 30 percent surcharge that they paid to Apple in a transaction between them and Apple, which Apple makes them engage in on a store owned and operated by Apple, and which Apple keeps entirely for itself. Notwithstanding all of those well-plaid facts in the complaint, the district court concluded that those direct purchasers under the Illinois brick bright line test that was enunciated by the Supreme Court in 1977. That test merely says that in order to have standing under the antitrust laws, you must be a direct purchaser of the monopolized or allegedly monopolized product from the alleged monopolist. That is precisely what happened here. As I said. Obviously, the district court characterized the transaction just a little bit differently, right? No. Respectfully, Your Honor, I think the district court did not do that. I think the district court misunderstood the legal standard that it needed to apply. Instead of following the U.S. Supreme Court's decision in Illinois brick, as this Court has interpreted it for the last 30 years, which is to say you look at the substance of the transaction and look to see if there's anyone between the plaintiff and the monopolist to determine whether you are a direct or an indirect purchaser. The district court said, well, notwithstanding the fact that the plaintiff dealt directly with the alleged monopolist, paying the alleged monopoly price for the monopolized product, notwithstanding that, because there was a separate, unrelated transaction between Apple and the app developers, the court said that made the plaintiffs, in this case, indirect purchasers. We think the court misconstrued the clear, bright-line standard of Illinois brick, as this Court has interpreted it, beginning in the Shamrock Farms case, which the Court decided in 1984, continuing to the Delaware Valley surgical case, which this Court decided in 2008. The Court, this Court, as virtually every other circuit court in the country, has referred to the Illinois brick standing requirement as a bright-line rule. It is a jurisprudential rule that simply keeps the court out of what would otherwise be difficult economic tracing problems to determine how much of the economic injury flows to the ultimate purchaser versus an indirect purchaser, had there been one. There wasn't here. The plaintiffs dealt directly with the monopolist. They paid the monopoly price, which Apple kept entirely for itself. And so under this Court's jurisprudence, which is to say, apply Illinois brick, literally apply the bright-line test as a bright-line test, look at the---- Sotomayor, I'm very sympathetic to your argument, and I'll assume for purposes of what I'm about to say, that this is an antitrust violation. I'm not saying that it was one, but for purposes of what I'm about to say, I will assume that it is. Okay. I think Justice Brennan got it right in Illinois brick, but he lost. Illinois brick and cases in which you have tangible goods, those cases are pretty easy, because you take the tangible good, in that case a concrete block, you put it in, you sell it through a middleman, you put it into a building, and then the person who buys the building says, hey, I got hurt, and I think they did. And Brennan says they should be able to bring the suit out of the Clayton Act. The majority of the Court says no. When we're dealing not with physical goods that get incorporated into something else or pass through various hands on the way eventually to an ultimate purchaser, the application of the Illinois brick rule is fairly easy. When we're dealing with electronic things rather than physical goods, it becomes more complicated. But this case I think is less complicated for us because of our decision in the ATM case. How is this case why don't you lose based on the rationale of Judge Smith writing for the panel in the ATM case? Your Honor, I'm glad you asked that question. Let me first explain. That's what they always say when they say, oh, shoot, here comes that question. No, actually, I am glad you asked the question. First, let me answer directly why this case is not like ATM, and then let me respond to the broader question of the Illinois brick policy. First, with respect to why this case isn't like ATM, I think the answer is very simple. In this case, the plaintiffs complain about the surcharge they paid that was imposed by Apple, the party they dealt with. So you have Apple imposing a 30 percent surcharge on all the apps that were sold on its store, and you have the plaintiffs paying Apple that surcharge directly. In the ATM case, there were actually two different charges that were at issue. One was the bank intercharge fee that was negotiated between the members of the ATM network. They were essentially the banks who all agreed among themselves that they would pay each other for transactions when foreign cards, not foreign in the sense that we usually use the words, but not your own cards are used at your ATM. That is what the plaintiffs alleged was monopolized. That's the charge, the bank intercharge fee that the plaintiffs say was price fixed. The impact of that was felt by some but not all card users who, when they used a foreign bank, inserted their card and were charged an ATM fee by the bank that they used. So there was a second fee that was at issue in the ATM case. The intercharge fee, which was the supposedly monopolized fee, and the ATM fee, which was the fee passed on to the card user. And the court there said, in ATM, this court said, under Illinois BRIC, we're not going to look at anything other than the fact that the plaintiff does not use and pay the fee that it alleges was price fixed. And so applying Illinois BRIC's bright line literally, the plaintiff is an indirect purchaser of that fee. And to whom did the cardholder pay the fee? To whom does the cardholder pay the ATM fee? Well, that's an interesting question because what happens is when you insert your card, the machine dispenses. Let's say you ask for $100. The machine dispenses $100 to you. You take $100. The machine then says to the bank that you used, charge $102 or so for this transaction, which that foreign bank who has the machine then sends to your bank. Your bank charges your account, your checking account or your savings account, charges your account $100, which is what you withdrew, plus the $2 that the foreign bank says is charged, except not always. Because we know, for example, some banks advertise that they let you use your ATM cards anywhere at any bank free of charge. And other banks may have a policy where for their better depositors or their larger depositors, they say we'll waive all your fees. We'll waive your checking fees. We'll waive your overdraft fees. We'll waive your ATM fees and so on. So. Breyer. It's a very simple answer to Judge Fletcher's question. I'm sorry. I'm trying to answer. The customer pays the customer's bank, not the owner of the ATM. Correct. Period. That is correct. Okay. That is correct. And forgive me. I tried to answer it that way, but clearly not as articulately as Judge Gittleman. Is it? The broader policy issue is answered by this Court's prior decision in an earlier case, and forgive me, I'm forgetting whether it was the Delaware Valley case or in ATM itself, where the Court talked about the purpose for the rule. And one of the purposes is to make the antitrust laws easier to enforce. We're not trying to make the antitrust laws harder to enforce. We're trying to make them easier to enforce. And Justice White discusses that at length in Illinois Brick, saying, you know, it's going to make it extraordinarily complicated if we've got to figure out the contribution of the ultimate price that's attributable to the antitrust violation. And in most cases, I agree that jurisprudentially it's sound to say we're not going to make the Court have to make those difficult kinds of decisions in terms of how much of this is passed off between different levels of distribution. But here there wasn't any. It was paid directly to Apple. It was kept entirely by Apple. If the Court has any more questions on that issue, which was the only issue decided by the district court, I'm happy to answer them. If not, I'll use some of my time remaining to address the alternate ground that Apple has raised in its motion, which is whether the plaintiffs have adequately alleged an appropriate aftermarket antitrust violation under two cases in particular, one, the Supreme Court's case in Kodak, which was an appeal from this Court's decision in that case, and also this Court's decision in Newcal Industries. That was never reached, though, by the district court. That is correct, Your Honor. And I'm happy to use my time. I have another question, and I don't want you to use your time with it. No, I would prefer to answer your questions than to move on to another area. There's another issue here about injunctive relief and Illinois Brick not applying to claims for injunctive relief. Was this raised in the district court when you were defending the motion to dismiss? I believe it was, Your Honor, but as I sit here today, I cannot honestly recall the answer. But I know we addressed the Court's issues in our briefs exhaustively. I don't recall that it was discussed during the oral argument on the motion, but I believe all of the issues were addressed in the briefs, which were rather extensive in the district court. Forgive me for not being certain of that. But that's primarily – look, I think the easy answer to this question is apply the Illinois Brick standard the way this Court has always applied the Illinois Brick standard, which is literally. And when a consumer deals directly with an alleged monopolist, that consumer must have direct standard. This looks an awful lot like a pass-through. That is to say, the substance of the transaction is I, the consumer, buy the app, the app is sold to me, and the 30 percent is pass-through. If I just call it a pass-through and I don't get very fancy in my analysis, Illinois Brick applies. So why do I have to get any fancier than just calling it a pass-through and I've done it? I would agree with that if the facts were a little bit different. In the traditional case where the price is fixed at a level that is distant from the consumer. For example, if the apps manufacturers had all agreed to set prices for applications and they among themselves agreed we're not going to charge any less than $3 for apps on the app store. We're just not going to do it. And then they charge that to Apple, which then passes it on to the consumer, then yes, the words pass-through might make sense because the charge is remote from the ultimate payer. Like, for example, in the ATM case. It's remote. The payer is the customer who doesn't, he's not at his bank, that's why he has to pay this fee. So there is something that's pass-through or not pass-through depending upon what the foreign bank decides to do. But in this case, there can't be a pass-through. There's but one transaction. And there's but two parties to it. There's the plaintiffs and Apple. To look beyond that, to look to the substance of the transaction, if you will, which I think is what the district court did. Sotomayor, in a different way, what is the purchaser buying? Is the purchaser buying the app? Is the purchaser buying Apple's willingness to support the app? Because depending on what the person is buying, it may be easier or harder to figure out whether this is a pass-through. Well, I'll answer the question honestly. The purchaser is buying the app. The purchaser has no choice. If somebody has an iPhone that they paid $500 or $600 for and they want to put an application on the iPhone, they must. They must go to the app store because Apple makes them. It doesn't give them any choice in the matter. Apple forces them to do that. And what Apple gets in return for that, not that there's any reason for it other than a successful business model, is the ability to charge that 30 percent surcharge. But the customer wants the app. The customer doesn't care where he shops for the app. He wants the app. Apple inserts its fee right there at the retail level with the customer who deals directly with Apple. Why is it, if we're looking at sort of the real economic substance of the transaction, why do we not look at Apple as just, that's the convenient way to have the money change hands. But the substance of the transaction is I'm buying an app, I'm paying a dollar, and Apple gets 30 percent of it. And Apple is just, that's just a convenient way for me to send the money to the seller of the app. Well, again, I think for two reasons. One, the policy reason that, number one, it misconstrues the purpose for the standing requirement of Illinois BRIC and it disregards 30 years of jurisprudence in this Court that says we don't look behind the surface of the transaction to examine its substance because that might invite the kind of difficult standing analysis that the Court wants to avoid. But the second reason is the consumer doesn't care where he buys his apps. He's not going to Apple for convenience. He's not going to Apple because he wants to. He's not going to Apple because he's agreed to. He's going to Apple because Apple makes him do that. And the only reason Apple does that is because they get to do what they've done. They get to impose this 30 percent charge. This is exactly what the antitrust laws are intended to prevent, and it's exactly why we should here, we should simply follow Illinois BRIC literally. We should look to the surface of the transaction, not try to parse apart its substance and say a direct purchaser who buys a monopolized product at a monopolized price and deals only with the monopolist plainly has standing to bring a claim. Now, whether we can prove that claim or not, we'll wait to trial to decide that. But for the purpose of whether there's injury for which the plaintiffs have standing, undoubtedly the answer to that is yes. Kennedy. So your entire argument on this issue, on the Illinois BRIC issue, is that this transaction doesn't come within the terms of Illinois BRIC. Exactly. And you're not arguing that, you know, maybe it does, but we're entitled to some kind of exception. No, no, quite the contrary. We want the Court to enforce Illinois BRIC literally as it has for 30 years. If the plaintiff deals directly with the monopolist and pays the monopoly price to the monopolist when it buys a monopolized product, that is direct standing. And anything else beyond that does exactly what Illinois BRIC was intended not to do. It unnecessarily invites judicial interference into very complicated transactions when it's not required here. Okay. We've taken you over. Yes. But we'll make sure to give you a chance to respond. Thank you very much, Your Honors. May it please the Court. Daniel Wall for Apple. And if I may, Judge Tshishima, it's very nice to see you again. Nice to see you. It's been a long time. I'm glad that neither of us have aged. When all is said and done, the Illinois BRIC doctrine is not just about formalism and liberalism. It is about trying to determine whether a plaintiff's theory is correct or not. And whether the theory of injury in the case involves pass-through or not. That is the question that Justice White addressed at great length. And it has been, no doubt, a controversial decision. But it has been the Federal rule without exception since Illinois BRIC. And in every one of this Court's cases, it has focused in on the fundamental question of does the theory of the case involve pass-through economics. Because the plaintiff is saying that their injury is because something happened upstream at a different level of a market which inflated the price that they paid. This is a hard case for me, though, because the ordinary way the pass-through operates and the ordinary way in which the pass-through prevents the plaintiff from bringing suit is that the plaintiff purchases a product, the seller of the product passes through and incorporates into the price for that product something that's been charged by an upstream seller. So in the ordinary pass-through case, the buyer, the purchaser, the plaintiff is not dealing with the alleged monopolist. Here, we're dealing with the monopolist. That's the ordinary case having to do with your classic brick-and-mortar good that it passes from a manufacturer to a wholesaler to a retailer is everything that you've just said. And Illinois BRIC is such a case, and I dare say that the majority of the cases that exist. Kennedy. So I can call it a pass-through, but it's not your normal pass-through, as is pointed out by your adversary, because the customer is dealing with the alleged monopolist directly, paying the alleged monopolist directly, and there's absolutely zero ambiguity as to the amount of money that's going to the alleged monopolist. That's — that may be true, but if I may, I would suggest to you that while it is a different case, it is actually as easy or easier, and let me try to explain why. What this model is about is that Apple acts as the agent of the app developer. There are over a million apps. There are over 250,000 developers. They set the price for their apps. Apple does not set the price for any apps except for the very, very few that happen to be published by Apple, but that's by far the exception. The vast, vast majority of them are by independent developers. Those developers understand that if they charge for the app — free apps don't matter in this conversation — but if they charge for the app, that they will pay 30 percent of what they have decided to charge. And — Do they get to decide what they charge? Absolutely. They charge whatever they want. Apple has zero price-setting role. This is the defining feature of the agency model that is commonly used in electronic commerce. In economic terms, the economists would say that the pricing authority is delegated to the publisher of the apps. The platform — and it can be Apple, it can be Amazon — Do we have in the record that we can look at, I guess it's the complaints — Right. — mechanism, do we have an allegation that tells us that the app seller, developer and so on, gets to set the price without limitation by — Absolutely. And this is — the history of this case and why we're here in a nutshell is about very, very patient efforts to get a clear-cut answer from the plaintiffs as to whether they were claiming that Apple sets the app price, either because it sets the total price or because it takes a pre-established developer price and adds something to it. Or whether this is a circumstance in which the developer sets its price knowing that there will be a commission if it takes advantage of this opportunity. And for the longest of time, and respectfully, I would say, including the argument here today, they're trying to hedge this. But let's be clear. There isn't the slightest doubt about this because there would — you know, if Apple was setting the price of the apps themselves, there would be hundreds of thousands of developer witnesses of this. There would be no ambiguity about it whatsoever. And so Judge Gonzales-Rogers, the first time she dismissed this complaint, said, I see a tension in what you're saying. You keep talking about this markup, but the complaint doesn't allege a markup. The complaint is alleging a pass-through theory. And she says, I'm not going to rule on the Illinois brick issue while I see this dissonance between what you're arguing and what you're pleading. So re-plead. And she essentially told them, not so subtly, that when you re-plead, you have got to make it clear how the money floats, who is setting the price and whether this is something where Apple is setting the price or whether this is the developer setting the price and Apple taking this commission. That led to the second amended complaint, and in particular to paragraph 41, which is at ER 70 and 71, in which, again, the plaintiffs tried to hedge on this issue. And so when we got to the final motion to dismiss hearing, the very first thing that Judge Gonzales-Rogers said to them, and this is at ER 56, was, I gave you some pretty clear instructions in my last order as to the information that you are supposed to plead here. And in quoting, she says, those questions still weren't answered, and perhaps it's because you don't want to answer them, but it appears to me that the complaint is trying to skirt around the ATM case. She thereafter engaged counsel in what I think could probably be fairly characterized as cross-examination, and it led to the moment that it's at ER 60 where counsel said that, indeed, the economics of the situation is that the developer is going to increase its price to cover Apple's demanded profit. And that's when this was over, because that's the moment that it's crystal clear that even though it may not be a traditional brick-and-mortar case, this is how a non-party, the developer, and in fact hundreds of thousands of them, make independent pricing decisions cognizant of the fact that they're going to have to pay a certain commission to Apple should they use the App Store. Kennedy. Please, please. Kennedy. Judge Gonzales-Rogers says this at the beginning of her analysis section, an analysis under Illinois brick centers on whether the alleged unlawful fee was paid directly or through a pass-through. Right. Now, I gather you think that's a correct question. But maybe, this is another way of arguing, maybe you can argue in theory, you know, that it's a pass-through, but as a matter of fact, it is paid directly. Well, as a matter of, say, privity, it is. So was the case in ATM. So was the case in Your Honor's. That's not correct, counsel. I'm sorry. I have to really disagree with you there. ATM, the customer pays its bank, his or her bank, I should say, the disputed fee. And it was that fee that was disputed in that case. And there's another big difference that you don't really address at all. And that is that the ATM case was on summary judgment. There was a record. And, in fact, the ATM decision itself mentions this as a distinguishing fact. The motion to dismiss an ATM was denied. There was a summary judgment where they got into this. And there's a, this is right, I'm reading not from the Fed third opinion. I'm reading from a different opinion. But it's right before the second Roman numeral two, I was going to say argument, but it's a heading. And the court, this court says plaintiffs do not pay this allegedly unlawful fee directly. Their banks do and, therefore, are not directly harmed by it. That's right. All we're looking here is at this point, in this case, is on the face of the complaint, do they allege that they are a direct purchaser? And paragraphs 40 and 41 very clearly allege that they are. Mr. Chairman, I was involved in the ATM case. And I can absolutely guarantee you that the argument that the plaintiffs were making, both to Judge Breyer and to this Court, was exactly this argument, that we are paying the fee to conspiring defendants in the vast majority of the cases. But that was a price-fixing case. No, but it doesn't. It was a monopoly case. But for purposes of Illinois BRIC, Illinois BRIC is a standing principle that is derived from Section 4 of the Clayton Act and the requirement that a person be injured in their business and property. It doesn't have different rules for price-fixing versus monopolization cases and so forth. Well, I think it has different applications because the price-fixer may be an indirect seller to the plaintiff in a price-fixing case, whereas when you have a monopolizer, an alleged monopolizer, and I think they've got a lot of hurdles ahead of them, should they go ahead. But when you allege that a party is a monopoly and you are buying directly from that party, it seems to me you have a different situation than you have in a price-fixing case. Respectfully, I disagree. And I'll give some examples. And Judge Tsushima will certainly remember one, because in the Kodak litigation, which was monopolization litigation, there was a consumer class action, no Illinois BRIC issue at all, because Kodak was setting the service price to its customers. In fact, Susan Ilston was the plaintiff's counsel in that case, brought a class action. And even though it's a monopolization action, you didn't have to worry about Illinois BRIC, because you had the monopolist setting the allegedly monopolistic price. Here, the alleged monopolist is not setting the monopolistic price. It is setting what the... It depends on what you mean by the monopolistic price. It may well be true that the app developer gets to set the ultimate price, that is to say what's the dollar amount. Right. But Apple is clearly setting the percentage price. But that is the theory... So why is that a difference? Because that is the theory of both the ATM case and the antecedent case that Judge Tsushima was involved with, which was the Kendall v. Visa case. In both of those cases, the allegation was by setting an antecedent fee, and it was the interchange fee in ATM, and it was actually also called interchange, but it was a different fee in the credit card case, Kendall, that it was a device to have the defendant banks inflate their cost structure with a phony fee, which they could collect from the consumers that they were in privity with. I'm less interested in that case than I am in this one. I think it's undisputed that what Apple does is say we want 30 percent. Yes. And they've set that. And if the dollar amount of the app goes up, the 30 percent goes up. Apple sets it. Apple gets to charge it. Right. And Apple charges directly to the purchaser of the app that amount. So why is that a pass-through that's analogous to the other clear, old-fashioned pass-throughs? Because what we need to think about is the antitrust definition of an injury, right? And so the antitrust definition of an injury here is what is the super competitive component of the price, the part which isn't competition on the merit, but has this anti-competitive nature to it. The theory of the case is that apps developers, in their profit-maximizing selves, hundreds of thousands of them, choose different prices, end prices, depending upon what they have to pay for the distribution. Their theory is, is that the 30 percent is almost all super competitive, if not 100 percent super competitive. So that they'll decide, well, I really would like to charge $12, but I'm going to charge 15 because I have this 30 percent. The problem, the Illinois problem, in a nutshell, is that that decision will be made hundreds of thousands of times by different developers, depending upon what they believe is profit-maximizing for them, given that cost and the demand for their products. But don't we need a record before we could reach that conclusion? I don't, I think that it is, it is, counsel said it at ER 60, that the developer is going to set up a different price than it would set, given that 30 percent. And the problem is It's their theory, but they've alleged the direct purchases. But the Illinois brick wall, as this Court put it in Kendall, is intended not to go down that path. In fact, I would submit that there are certain doctrines, like standing and statute of limitations, which need to be applied up front if they're going to have meaning here. And the question here is, is there any doubt in this complaint now that there is a pass-through? No. Judge Gonzales-Rogers went through two rounds of this to try to get to the essence of that question. When she got the answer that in fact the 30 percent is going to influence the developer's price, it was clear that even though it may be a non-traditional setting, it's actually a pretty common setting now in e-commerce, but certainly different than the brick and mortar world, that this was necessarily going to involve pass-through. All right. Mr. Wall, if this is a pass-through, then who is a direct purchaser? The app developers, who could sue us tomorrow for saying that 30 percent is too high. But they're unlikely to do that. Well, we think they're unlikely to do it because they love the system. But they could. I know they do. So what about you? As you know, we have this, I'll call it the special exception in the Ninth Circuit to the Illinois brick wall. The royal printing. There's something like, you know, if the direct purchaser is unlikely to sue, then the indirect purchaser next in line can sue. Right. So, of course. Is this that case, then? Well, no. Look, in the ATM case, I think the Court made it quite clear that that exists, that came from the Freeman case, and that it exists only because of the control that the defendants had over Sandecor, which was the agent that was setting the MLS fees. It's clear Apple has this control over all these app developers, right? It has zero control. You can't sell in my store. But it has zero control over the only thing that matters, which is their pricing. That, to me, is — Well, they don't care about that. All they care about is the 30 percent. But, no, they don't. Their single, you know, their allegation of injury in paragraph 45 of the complaint is, it's not about the iPhone. It's not what Apple sells. It's about what the developers sell through the App Store. It's exclusively about what the developer — the prices that the developers set for the apps. And how can it not be a pass-through when Apple has no direct say in that? The only way for that theory to make any sense is because the fee that Apple charges to the developers influences their pricing, which is what ultimately counsel acknowledged. And that's what makes this an Illinois BRIC case. I know I'm way over my time. I'm happy to stay here as long as you want, but — Any further questions? No. Excuse me. There was one. I just wanted to answer Judge Gellert's question about the injunction. It absolutely was not raised below. And the reason we know that is because we're here. There would have not been a final appealable order had it been raised because it doesn't — Illinois BRIC doesn't bar the injunctive relief claim. But do you think it was waived? It was absolutely waived. Why don't you put two minutes on the clock, please? Thank you very much, Your Honors. I'll try to be brief. First, let me just say that the suggestion by Apple that the developer is the direct purchaser is ludicrous. The developer is the seller, and we all know that. We all know what happens. The suggestion that there's some pass-through of any price through the developer, it just strains credibility. By that reasoning — look, Apple exacts a 30 percent tax for all the sales on its app store. Is the State of California the direct purchaser in any transaction for which they collect a sales tax? I mean, it just makes no sense. I think that to answer a couple of questions the same way, we don't precisely know what happens between Apple and the developers because we've not had one drop of discovery. This was a motion to dismiss — granted a motion to dismiss a second amended complaint, but we allege in paragraph 4 of the complaint what happens. We allege in paragraph 41 of the complaint what happens. We allege in paragraph 40 of the complaint what happens. The behind-the-scenes, behind-the-curtain mechanics of it, we don't know. And so when my colleague, Mr. Schmidt, answered the Court's question at the oral argument, he simply said it wouldn't matter whether Apple paid or charged or set the fee or didn't set the fee. It makes no difference because the transaction is between Apple and the consumer. And it is a transaction by which Apple collects 100 percent of its 30 percent tax on this — on each and every one of these now billions of transactions. If the Court has any questions, I would like very much to answer them, but otherwise I'm satisfied that you've heard enough on this very, very technical issue. Thank you, Your Honors. Thank you both for your quite helpful arguments. Pepper v. Apple now submitted for decision. And that completes our arguments for this morning. We are now in adjournment.
judges: Tashima, W. Fletcher, Gettleman